IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action |
| | ) | |
| v. | ) | No. 05-10040 -01, -02 -WEB |
| | ) | |
| IGNACIO ZAVALA, and | ) | |
| JOSE ALBERTO LOPEZ-MORALES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Memorandum and Order**

This matter came before the court on May 9, 2005, for an evidentiary hearing on the defendants' motion to suppress evidence. The court took the motion under advisement at the conclusion of the hearing. For the reasons set forth herein, the motion to suppress is denied.

I. *Facts*.

The court finds the following facts from the evidence presented at the hearing. On February 16, 2005, at about 10:20 p.m., Kansas Highway Patrol Trooper Jerrad Goheen was on duty in a patrol car traveling westbound on Interstate 70, when he saw an eastbound vehicle approaching with a missing or inoperable front head lamp. The vehicle was a Chevrolet van. Operation of the vehicle with a missing head lamp was a violation of Kansas traffic laws. Goheen turned his car around on the median to make a traffic stop. When he turned on his emergency lights the van pulled over to the side of the highway. Goheen radioed in a license plate check on the vehicle's North Carolina plates. The ensuing encounter was recorded on videotape. Govt. Exh. 1.

Goheen approached to speak to the driver, Ignacio Zavala. Zavala did not roll down his window, but instead opened a small "wing" vent window near the driver's door. Goheen asked Zavala to open the door so they could communicate. Zavala appeared reluctant, but opened the door. When he did so, Goheen could smell a very strong odor of air freshener. Goheen knew from his training and experience that air freshener is frequently used by drug traffickers to mask the scent of illegal drugs.

Goheen explained that he made the stop because of a missing headlight. Zavala said he knew about the light and had already been ticketed for it an hour or so earlier by another Trooper. He produced a warning citation apparently issued by KHP Trooper Troy Smith, and also produced his license and proof of insurance. Goheen knew Trooper Smith and knew that he patrolled primarily in Sherman County, probably a hundred miles or so from this encounter. Goheen asked Zavala and his passenger where they were from and where they were headed. When Zavala said they had been in Denver and were headed back to North Carolina, Goheen asked if they had been on vacation and how long they had been there. Zavala said they had been in Denver for about a week visiting family. Goheen asked to see Lopez' identification, but Lopez said he didn't have any. When Goheen asked why, Zavala translated the question into Spanish for Lopez and then translated Lopez' reply. Zavala said Lopez stated it was because he had just gotten out of jail. Lopez indicated he had been incarcerated for drug possession. Goheen asked if Trooper Smith had checked their licenses. Zavala said he had. Goheen told Zavala he was just going to double check on it and would be right back.

Goheen returned to his car and requested a driver's license and criminal history check on Mr. Zavala. While awaiting a reply, he contacted Trooper Smith to ask him about the warning citation. When he contacted Smith, Smith confirmed that he had issued the citation. Goheen could tell from Smith's voice

2

that he was suffering from a cold or flu. Smith indicated he had done a quick and routine traffic stop without any additional investigation. Goheen was also apparently informed by dispatch at around this point that Zavala's driver's license was valid, but he did not receive a report back on Zavala's criminal history.

After a few minutes, Goheen returned to the van. He went to the passenger-side window and handed back Zavala's license and insurance information. He asked Zavala when he was going to get the head lamp fixed, pointing out there was a Wal-Mart just a few miles up the road that would probably have the lamp. Goheen then told the men to have a safe trip and backed away from the window momentarily. He returned to the passenger window, however, just as Zavala was preparing to leave, and asked if he could ask the men a couple of quick questions. Zavala said yes. Goheen asked if they had a couple of minutes; Zavala again said yes. Goheen asked about their trip and what part of Denver they had visited. Zavala said Denver City. Goheen asked if they knew the address of the family members they had visited in Denver; Zavala initially said he did not. Goheen asked Lopez about his prior conviction; Lopez indicated it was for a small amount of marijuana. Goheen also asked whether the men had any drugs, guns, or large amounts of cash in the van. When one of them said they did not, Goheen asked, "You don't mind if I look inside the car?" Zavala said no, he didn't mind,[1] and he explained to Lopez what the Trooper was asking. Goheen told the men he was going to have them step out of the vehicle, and he had them stand by the front of the van. When Lopez -- who had been slumped down in the front passenger seat -- first sat up to get

---

[1] The court bases this finding on the uncontroverted testimony of Trooper Goheen, which the court finds credible. The court notes that on the videotape of the encounter, Zavala's response to Goheen's request to search cannot be heard because Goheen's microphone was not recording at that moment. No evidence was presented to show why the microphone cut in and out during the encounter, but the circumstances suggest that at this particular point it was probably due to an equipment malfunction.

out of the van, Goheen noticed that the space between the van's ceiling and Lopez' head and chair was unusually narrow. At that point Goheen believed that something on the van -- either the floor or ceiling -- had likely been altered from its original condition. He knew from his training and experience that drug traffickers sometimes use compartments in a vehicle's floor or ceiling to transport drugs.

Goheen went to the rear of the van and opened the back door. He focused initially on the rear floor area and tried to determine whether there was a compartment under it. It appeared to him that bolts holding down the back bench seat were scratched up as though they had been removed. The carpeting in the back also appeared to have been glued down in an unusual manner. As he was beginning his examination, Goheen received a report from dispatch informing him that Zavala had a prior criminal history for drugs. After looking at the back floor and other parts of the car, Goheen eventually examined the ceiling of the van more closely. Among other things, he again noticed that the space between the top of the front passenger seat and the ceiling was very narrow, and he also observed that the seat belt had been anchored up inside the head liner in an unusual manner. Goheen was sure the seat belt had not been factory-installed in this manner. He suspected that there was a hidden compartment in the ceiling and/or the floor. He wanted to do a more thorough examination, but it was difficult to see and he was somewhat concerned for his safety. He asked Zavala if he would mind following him to his office so he could examine the van more closely. After hesitating, Zavala asked Lopez in Spanish about the request. Goheen said it was up to Zavala since it was his van. Zavala indicated he did not want to follow the trooper to the office.

Goheen went back to his car to contact another officer. He spoke with a sheriff's officer who was nearby and told him he would like some assistance. Goheen then went back to looking at the van. After a few minutes, he focused on the ceiling. His examination led him to believe there was a void between the

4

roof and the interior head liner and that the ceiling had been modified in some manner. He believed there was likely a false compartment in the ceiling. He asked Zavala whether he had done something to the roof of the van. Zavala said no. When the sheriff's officer with whom Goheen had spoken arrived, Goheen showed him the back of the van and the ceiling. The sheriff's officer agreed that there appeared to have been a modification of the ceiling. Goheen determined that he would take the van to the station for a more thorough examination. He told the two men to follow him to the station because he was going to more closely examine the vehicle. Zavala and Lopez got back in the van and followed Goheen to the Hays Law Enforcement Center. At the Center, officers removed the head liner in the van and found a welded-in compartment in the ceiling. When the compartment was opened, the officers found approximately 271 pounds of marijuana.

II. *Summary of Arguments*.

The defendants argue that the marijuana must be suppressed as the product of an unlawful search and seizure. They contend Trooper Goheen was obligated to let them proceed on their way after he found out Zavala had already been issued a warning citation for the defective head light. They believe the Trooper's failure to let them go and his questioning about their travel constituted an unreasonable seizure. Defendants dispute the Government's assertion that they voluntarily agreed to stay and answer questions after the Trooper confirmed the validity of the citation. They maintain that a reasonable person in that situation would not have felt free to leave when the Trooper continued asking questions. They further argue that the Trooper never had reasonable suspicion to detain, or probable cause to arrest, either of them. Moreover, even assuming Zavala initially gave consent for a search of the van, they argue that the consent was tainted by the unlawful detention and that any consent was revoked when Zavala declined to follow

5

the trooper to the station.

III. *Discussion*.

A traffic stop is a seizure under the Fourth Amendment. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir.1995) (en banc). A routine traffic stop is analogous to an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). The reasonableness of such stops are evaluated in two respects: first, whether the officer's action was justified at its inception, and, second, whether the stop was reasonably related in scope to the circumstances that first justified the interference. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994).

A traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction. *Botero-Ospina*, 71 F.3d at 787. There is no dispute here that Trooper Goheen was justified initially in stopping the defendant's vehicle because the defendant was violating Kansas law by operating the vehicle with only one working head lamp. *See* K.S.A. § 8-1728.

Insofar as the appropriate scope of a traffic stop is concerned, the Tenth Circuit has consistently held that an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994). Thereafter, when the driver has produced a valid license and proof that he is entitled to operate the car, he generally must be allowed to proceed on his way without being subjected to further delay for additional questioning. *Id.* Further questioning is permissible in two circumstances, however. First, the officer may detain the driver for questioning unrelated to the initial traffic stop if the officer has an objectively

reasonable and articulable suspicion that illegal activity has occurred or is occurring. *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993). Second, further questioning is permissible if the initial detention has become a consensual encounter. *United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir.1991).

As an initial matter, the court finds the Trooper's questions to Mr. Zavala's about his travel plans and about his reason for travel did not render the detention unreasonable. *Cf. United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir.2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). Even assuming some of the questions asked required some minimal level of objective justification, the fact that Zavala was reluctant to open the door and that the officer was able to smell a strong odor of air freshener coming from the van would be sufficient reason to prolong the encounter to ask the defendant a few questions about his trip.

The court also concludes it was reasonable and within the appropriate scope of the stop for Trooper Goheen to run a check on Zavala's license and criminal history notwithstanding that Zavala showed him a recent warning citation for the infraction. First of all, the officer was not required to accept Zavala's account of the prior citation. Because Goheen had witnessed a violation, he was entitled to run a license and criminal history check of his own, and if he so chose, to issue another citation. The court notes that without checking for himself, Goheen had no way of knowing for certain whether Zavala in fact had a valid license and whether he was entitled to operate the car. Moreover, a criminal history check of Zavala was reasonable and prudent under the circumstances given that Goheen detected a strong odor of air freshener and was told that Zavala's passenger had no identification because he had just gotten out of jail for drug possession. *Cf. United States v. McRae*, 81 F.3d 1528, 1536, n.6 (10th Cir. 1996); *Florida*

*v. Royer*, 460 U.S. 491, 501 (1983) (request for identification was permissible). Additionally, the mere fact that Zavala had already received a warning citation did not immunize him from subsequent traffic stops for the violation, nor did it preclude him from being subjected to the normal inquiry accompanying such stops. Zavala's violation was apparently a continuing one under Kansas law, and nothing is cited to show that the Trooper could not have issued another citation if he deemed it appropriate under the circumstances.[2] In sum, the initial detention was reasonable under all of the circumstances.

After his initial check, Goheen returned Zavala's papers and told the men to have a safe trip. He then momentarily stepped away from the window before returning and asking if he could ask the men a few questions. Zavala said he could. The evidence showed the defendants voluntarily agreed to stay and answer questions and that the encounter at that point was consensual. The Tenth Circuit has noted that a routine traffic stop can become a consensual encounter once a trooper has returned the driver's documentation so long as "'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'" *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir.1997). The traffic stop was ostensibly concluded -- as demonstrated by the Trooper's actions and Zavala's preparing to drive off -- and the Trooper did not use any show of authority or coercion in these circumstances to pressure the men into staying and answering his questions. The Trooper's questions

---

[2] The defendants argue that the underlying purpose of the traffic stop was concluded once the Trooper was informed that Zavala had already been cited for the violation. But the Trooper was not only justified in conducting a brief inquiry to confirm the validity of the citation, he also could have issued another citation if he deemed it appropriate. For example, the Trooper could have concluded that the potential safety hazard posed by the defect, when considered with the fact that Zavala was on a cross-country trip and already passed up an intervening opportunity to remedy the defect, warranted the issuance of another citation. The fact that the Trooper chose not to issue his own citation in no way undermines the reasonableness of his brief detention of the defendants for a license and criminal history check.

8

conveyed rather clearly that their participation was voluntary and they were not required to stay (i.e., "Do you have a few minutes?"). Zavala promptly agreed to answer the questions. This was clearly a consensual encounter rather than a detention. The evidence further shows that Zavala thereafter voluntarily consented to a search of the vehicle. The government bears the burden of proving consent to a search was in fact voluntary. *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990 (10th Cir.1993). Whether consent is freely and voluntarily given is a question of fact determined from the totality of the circumstances. *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998). The government must show that the consent was unequivocal and specific and freely given without express or implied duress or coercion. *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995). Again, the evidence shows there was no show of authority or coercion by the Trooper in asking if he could look in the car. The evidence is that Mr. Zavala unequivocally gave permission for a search, and the court concludes that his consent was voluntary.

The court further finds that the Trooper's search of the van by the highway was within the scope and duration of the consent granted. The scope of a search "is generally defined by its expressed object and is limited by the breadth of the consent given." *United States v. Elliott*, 107 F.3d 810, 814-15 (10th Cir.1997) (internal quotations and citations omitted). The evidence shows that Mr. Zavala understood the Trooper was asking to look in the vehicle for drugs, and his consent thus entitled the Trooper to look anywhere in the van that drugs might be hidden. The court rejects Mr. Zavala's argument that he revoked his consent when he told the Trooper he did not want to follow him to the station. Mr. Zavala never conveyed to the Trooper that he wanted to limit the roadside search in any way, nor did he object to the Trooper's continued search after conveying that he preferred not to go to the station. *Cf. United States*

9

*v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) ("The general rule is that where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle."). A reasonable person would not have understood Zavala's response as a termination of his consent to examine the van on the highway.

      The court notes that within a few moments of beginning the search, the Trooper was aware of the following facts: Mr. Zavala had been reluctant to open his door and when he had opened it the Trooper smelled a strong odor of air freshener coming from the van; the passenger had just gotten out of jail for drug possession; Mr. Zavala had a criminal history for drugs; and the position of the seats in relation to the ceiling indicated a likelihood that the van had been altered by insertion of a compartment in either the floor or the ceiling. To the extent the defendants argue they were unlawfully detained in the course of the officer's roadside search of the van, the court rejects this argument because the foregoing facts known to the officer clearly constituted reasonable suspicion of criminal activity that justified a brief detention. Moreover, the officer thereafter determined that there was a void in the ceiling of the van and that the seat belt anchor in the ceiling had been modified, both of which bolstered his belief of a hidden compartment in the ceiling of the van. Once the officer observed these facts, the court concludes that the officer had probable cause to believe there were illegal drugs contained in the van. *Cf. United States v. Jurado-Vallejo*, 380 F.3d 1239, 1242 (10th Cir. 2004) (the officer's observations would warrant a reasonable belief that the vehicle contained a hidden compartment, and that such a compartment was highly likely to contain contraband). As such, the officer's removal of the van (and the defendants) to the station, and the non-consensual search at the station were reasonable under the Fourth Amendment.

10

IV. *Conclusion*.

The defendants' Motions to Suppress Evidence (Docs. 16 and 18) are DENIED.  IT IS SO ORDERED this   11th    Day of May, 2005, at Wichita, Ks.

> s/Wesley E. Brown
> Wesley E. Brown
> U.S. Senior District Judge